UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:11-cr-00205-JAW-8 |
| | ) | |
| ED COGSWELL | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

An inmate serving a fifteen-year sentence for his involvement in a cocaine base distribution conspiracy moves for compassionate release in light of his medical conditions and an alleged risk of serious complications should he contract the COVID-19 virus in prison.  The Court dismisses the motion without prejudice because (1) the inmate has not shown extraordinary and compelling reasons for his release, (2) releasing the inmate would endanger public safety, and (3) the 18 U.S.C. § 3553(a) factors do not support release.

**I.    PROCEDURAL BACKGROUND**

On August 20, 2013, following a jury verdict rendered January 31, 2013, *Jury Verdict Form* (ECF No. 390), the Court sentenced Ed Cogswell to one hundred eighty months of imprisonment, five years of supervised release, a $100 special assessment, and no fine for his part in a conspiracy to distribute twenty-eight grams or more of cocaine base.  *J.* (ECF No. 533); *Am. J.* (ECF No. 554); *Second Am. J.* (ECF No. 560).  Mr. Cogswell appealed his conviction and sentence, *Notice of Appeal* (ECF No. 535), and on December 5, 2014, the Court of Appeals for the First Circuit affirmed both the conviction and sentence.  *United States v. Trinidad-Acosta*, 773 F.3d 298, 303 (1st

Cir. 2014), *superseded in part on other grounds by regulation as stated in United States v. De la Cruz-Gutiérrez*, 881 F.3d 221 (1st Cir. 2018).

On August 6, 2020, Mr. Cogswell filed a pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *Mot. for Compassionate Release* (ECF No. 1029). The next day, however, the Court dismissed Mr. Cogswell's motion without prejudice because he failed to comply with the compassionate release statute's exhaustion requirement. *Order on Mot. for Compassionate Release* (ECF No. 1030).

On December 3, 2020, Mr. Cogswell filed a second pro se motion for compassionate release and further requested that the Court appoint Attorney Hunter Tzovarras to represent him. *Mot. for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)* (ECF No. 1033) (*Def.'s Pro Se Mot.*); *Mot. for Appointment of Counsel, to be Represented for (RIS) Compassionate Release* (ECF No. 1034). The following day, the Court granted Mr. Cogswell's motion to appoint counsel and ordered Mr. Cogswell to file an amended petition for compassionate release within seven days, or to notify the Court that the case will proceed on the initial petition. *Appointment of Counsel & Scheduling Order* (ECF No. 1038).

On January 15, 2021, after a series of extensions, Mr. Cogswell filed his amended motion for compassionate release. *Am. Pet. for Compassionate Release* (ECF No. 1055) (*Def.'s Mot.*). On January 26, 2021, the Government responded in opposition. *Gov't's Obj. to Def.'s Mot. for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i)* (ECF No. 1063) (*Gov't's Opp'n*). On February 2, 2021, Mr. Cogswell

2

replied. *Reply to Gov't's Obj. to Am. Pet. for Compassionate Release* (ECF No. 1068) *(Def.'s Reply)*.

## II.   FACTUAL BACKGROUND

The Court recounts Mr. Cogswell's criminal history and offense conduct. The Court draws much of this information from the Revised Presentence Investigation Report (PSR), prepared by United States Probation & Pretrial Services (PO) in anticipation of Mr. Cogswell's sentencing. *Restricted U.S. Probation Filing*, Attach. 1, *PSR* (ECF No. 1036). The Court relied upon and adopted the PSR, subject to minor revisions, when it sentenced Mr. Cogswell. *Id.*, Attach. 3, *Statement of Reasons* at 1. At his sentencing hearing, except for his offense conduct, Mr. Cogswell affirmed the accuracy of the facts in the PSR other than minor revisions concerning his receipt of a GED while incarcerated and his place of residence. *Tr. of Proceedings – Sentencing Proceedings* at 2:11-6:8 (ECF No. 617) *(Cogswell Sentencing Tr.)*.

### A.   Criminal History

Mr. Cogswell had a number of convictions in state court prior to his federal conviction. On April 22, 1997, he was sentenced to a $1,000 fine following a conviction for Theft by Misapplication of Property. *PSR* ¶ 33. He was also arrested for Theft by Unauthorized Taking or Transfer on December 17, 1997 concerning the theft of $702.45 of property. *PSR* ¶ 34. On August 31, 1998, Mr. Cogswell was sentenced to a 364-day suspended jail sentence, one year of probation, and ordered to pay $727.45 in restitution for the second theft offense. *Id.*

3

Mr. Cogswell had six convictions for Negotiating a Worthless Instrument. *Id.* ¶¶ 35-39. According to his PSR, these offenses occurred in 2001, 2005, and 2007 and arose from Mr. Cogswell's knowing use of bad checks to purchase items from several stores. *Id.* ¶¶ 35-39. Although the PSR does not include the purported face value of every bad check, it appears that in most cases the face values of the bad checks were less than fifty dollars. *Id.* ¶¶ 35-39. However, on one occasion Mr. Cogswell was sentenced to pay $294.25 in restitution, which suggests the face value of this bad check was significantly more than the others. *Id.* ¶ 39. For most of these offenses, Mr. Cogswell received no jail time and was sentenced to pay fines and restitution. *Id.* ¶¶ 35-39. However, Mr. Cogswell's two 2007 Negotiating a Worthless Instrument offenses resulted in concurrent forty-day and sixty-day incarcerative sentences. *Id.* ¶¶ 38-39.

On October 28, 2009, Mr. Cogswell was fined $150 for Representing Another's License or ID as his Own. *Id.* ¶ 40. That same day, he was also fined $200 for Forgery. *Id.* ¶ 41. An additional count charging Operating While License Suspended or Revoked was deferred. *Id.* According to Court records, Mr. Cogswell used a check and identification belonging to Michael Foster to make a purchase at a Big Apple convenience store. *Id.* However, the Big Apple cashier knew the real Michael Foster because he was her sister's boyfriend's father. *Id.* The cashier contacted her sister who told her that Mr. Foster was in jail. *Id.* The cashier then called the authorities and reported the incident. *Id.* Police located Mr. Cogswell and found him in possession of Mr. Foster's checkbook and identification. *Id.* Finally, on May 28, 2009,

Mr. Cogswell was sentenced to a $250 fine for operating a motor vehicle while his license was suspended or revoked. *Id.* ¶ 42. For Guideline purposes, Mr. Cogswell was a criminal history category II. *Id.* ¶ 43; *Statement of Reasons*, Attach. 1, *Findings Affecting Sentence* ¶ 5 (ECF No. 534) (*Cogswell Sentencing Findings*).

### B.    Offense Conduct[1]

Mr. Cogswell's prior state convictions pale in comparison to the seriousness of his federal offense. The investigation into Mr. Cogswell's federal offense was undertaken by a Drug Enforcement Administration (DEA) task force comprised of federal and local law enforcement. *PSR* ¶ 3. In October 2010, the DEA task force learned from a confidential informant (CI) that an individual in Maine was selling cocaine base on behalf of a drug trafficking operation headed by individuals of Dominican descent living in New York. *Id.* The CI advised that the individual received cocaine base from these New Yorkers, led by an individual known only as "Boss Man." *Id.* Law enforcement later identified "Boss Man" as Dawlin Cabrera. *Id.* Authorities also learned that members of Mr. Cabrera's drug trafficking organization routinely sold cocaine base for $375 in "ten packs" containing ten half-gram bags. *Id.* The operation also sold "twenty packs" containing twenty half-gram bags for $800. *Id.*

Over the ensuing months, the DEA task force gathered intelligence on Mr. Cabrera's organization. *Id.* ¶ 4. They determined the organization consisted of multiple individuals, including Manuel Trinidad-Acosta, also known as "Fish," who

---

[1]    While the Court recounts the complete history of the investigation and criminal activity in this case, the First Circuit's opinion in *Trinidad-Acosta*, 773 F.3d at 303-05, provides the abridged version.

sold cocaine base and cocaine in the Bangor, Maine area. *Id.* Near the outset of the investigation, law enforcement learned that several of the distributors were depositing large sums of cash into bank accounts in the name of Mr. Cabrera's alias, Rolando Rosario-Andujar, at a Bank of America location in Bangor. *Id.* Investigators also became aware that the distributors were depositing more cash into accounts under other names at the same Bank of America location. *Id.*

In November 2010, Mr. Cabrera spent more than $800 on a cellular telephone and "air time" for his distributors to use as the drug sale phone. *Id.* Initially, the CI told law enforcement about drug transactions taking place in Bangor at properties on Kenduskeag Avenue, Catell Street, and First Street. *Id.* However, in December 2010, Mr. Trinidad-Acosta rented an apartment on Ohio Street in Bangor. *Id.* From that point forward, the Ohio Street apartment became the principal base of operations for Mr. Cabrera and his associates. *Id.*

On October 21, 2010, and again on November 8, 2010, Mr. Trinidad-Acosta and a man named Jacob Garcia deposited $8,000 into an account under the name Rolando Rosario-Andujar at Bank of America's Bangor location. *Id.* ¶ 5. The two men made another deposit to the same bank account on November 30, 2010. *Id.* Each deposit was confirmed through the bank's surveillance system. *Id.*

On October 29, 2010, authorities went to an apartment on Kenduskeag Avenue in Bangor and asked if any men of Dominican descent were living there. *Id.* ¶ 6. An occupant admitted that a man he knew as "Fish" had been staying there but had left several days earlier. *Id.*

6

On November 12, 2010, authorities arranged for a cooperating individual (CI-1) to purchase cocaine base from one of Mr. Cabrera's associates. *Id.* ¶ 7. Agents watched the transaction and saw CI-1 buy 12.9 grams of cocaine base for $2,400 in pre-recorded funds. *Id.* A short time later, officers from the Brewer Police Department conducted a traffic stop on the vehicle involved in the drug transaction. *Id.*

On June 16, 2011, another cooperating individual (CI-2) contacted a different member of the conspiracy, Jowenky Nuñez, and arranged to purchase two "twenty packs" of cocaine base. *Id.* ¶ 8. Shortly thereafter, agents watched Mr. Trinidad-Acosta and his paramour and co-conspirator, Pari Proffitt, arrive at a predetermined location. *Id.* Upon arrival, Ms. Proffitt exited her car and entered a nearby business. *Id.* CI-2 briefly climbed into Mr. Trinidad-Acosta's car. *Id.* Then, CI-2 exited the car and Mr. Trinidad-Acosta drove away by himself. *Id.* Law enforcement attempted to follow Mr. Trinidad-Acosta's vehicle, which was heading toward the Ohio Street apartment; however, the vehicle made a series of random turns and stops so officers ended the surveillance. *Id.* Ten minutes or so later, Mr. Trinidad-Acosta returned to the pre-determined location, where he picked up Ms. Proffitt and CI-2. *Id.* CI-2 bought approximately 9.8 grams of cocaine base from Mr. Trinidad-Acosta for $1,600 in pre-recorded funds. *Id.* Ms. Proffitt counted the money. *Id.*

The investigation continued. *Id.* ¶ 9. Law enforcement interviewed various customers of the operation and one advised that he/she had seen a large bag of cocaine base at the Ohio Street apartment in January 2011 as well as a handgun. *Id.* Later

in the same month, the same customer saw five "twenty packs" and a distributor carrying a handgun. *Id.* A different customer told police that he/she bought seven to ten "twenty packs" of cocaine base from a seller who had obtained the drugs from Mr. Cabrera in October 2010 for $700 each. *Id.* ¶ 10. That customer further reported buying five one-half gram bags of cocaine base on three occasions from the Ohio Street apartment. *Id.* Three customers reported similar purchases from Mr. Trinidad-Acosta, Mr. Garcia, and Mr. Nuñez. *Id.* ¶¶ 11-13.

Mr. Cogswell joined the cocaine conspiracy in September 2010. *Id.* ¶ 14. Acting predominantly as a middleman, Mr. Cogswell would obtain cocaine base from the conspirators and sell it to customers. *Id.* On August 12 and 19, 2011, he made two sales of cocaine base that were recorded by agents. *Id.* During one of these sales, Mr. Cogswell stated that he "couldn't do anything until he was off the clock," meaning that he could not use drugs until he was done working. *Id.* Mr. Cogswell lived with his girlfriend at the Ohio Street apartment beginning in approximately September 2011. *Id.* Following his arrest, Mr. Cogswell gave a post-*Miranda* statement in which he initially denied selling cocaine. *Id.* Mr. Cogswell ultimately admitted that he obtained cocaine for friends but described this involvement as he "helped people out." *Id.*

As the investigation continued, several co-defendants/co-conspirators cooperated with the government and provided further information. *Id.* ¶ 15. Co-defendants repeatedly identified Mr. Cabrera as "Boss Man," stating that he orchestrated the conspiracy. *Id.* Mr. Nuñez acted as Mr. Cabrera's chief lieutenant,

8

managing the operation in Maine while Mr. Cabrera was in New York City. *Id.* Mr. Cabrera hired various couriers to transport cocaine base from New York to Maine by commercial bus. *Id.* The drug proceeds were either returned to Mr. Cabrera in New York or deposited in Bank of America accounts in Maine. *Id.* Bank of America records show that between October 2010 and late October 2011, a total of $202,559 was deposited under the name Rolando Rosario-Andujar. *Id.* Mr. Cabrera used that money for his own personal benefit and to pay his supplier for more cocaine base. *Id.* Various co-defendants informed authorities that from September 2010 through October 2011, at least 350 grams of cocaine base per month was transported by Mr. Cabrera's distributors in Maine, for re-sale purposes. *Id.* Others reported that as much as 700 grams of cocaine base were sent to Maine each month. *Id.*

On November 3, 2011, law enforcement executed search and arrest warrants at the Ohio Street apartment. *Id.* ¶ 16. Authorities found drug and expense ledgers, along with mail and furniture rental receipts in the name of Rolando Rosario-Andujar. *Id.* They also found a Hi-Point pistol and later determined Mr. Cogswell had traded this pistol to the conspiracy in exchange for drugs. *Id.* Acting on tips from witnesses, the authorities discovered several hidden compartments under the Ohio Street apartment where cocaine base was often stored. *Id.*

That same day, law enforcement executed a search warrant for an apartment on Garland Street in Bangor where Mr. Trinidad-Acosta and Ms. Proffitt lived. *Id.* Officers had been tipped off that a quantity of drugs had been moved to the Garland Street apartment following the search at the Ohio Street apartment. *Id.* There,

officers found 368 grams of cocaine base inside a safe. *Id.* Various co-defendants reported Mr. Cabrera was responsible for providing this quantity of cocaine base. *Id.* Inside the same safe, investigators also found a Ruger 9mm pistol and a copy of the lease for the Ohio Street apartment. *Id.* The lease identified Mr. Trinidad-Acosta as the tenant and other evidence established Mr. Trinidad-Acosta or Mr. Garcia paid the monthly rent for the Ohio Street apartment in cash. *Id.*

The PO determined Mr. Cogswell was responsible for 4.9 kilograms of cocaine base. *Id.* ¶ 18. This calculation was based on the statements of co-defendants who consistently told authorities that at least 350 grams of cocaine base per month was sent from New York City to Bangor, Maine, over a period of fourteen months. *Id.* The PO acknowledged this may be a conservative estimate because some co-defendants stated that as much as 700 grams of cocaine base were sent to Maine each month during the conspiracy. *Id.* The PO further reasoned Mr. Cogswell knew the conspiracy was distributing this much cocaine base because of how long he was involved in the conspiracy and the fact that he lived at an apartment used to distribute the cocaine base. *Id.*

## C. Guideline Calculations

The Court determined Mr. Cogswell was criminally responsible for between 840 grams and 2.8 kilograms of cocaine base, resulting in a base offense level of 34. *Cogswell Sentencing Findings* ¶ 2. The Court added two levels because Mr. Cogswell possessed a firearm. *Id.* ¶ 3. The Court added another two levels because Mr. Cogswell obstructed justice. *Id.* ¶ 4. He was a Criminal History Category II. *Id.* ¶ 5.

The Court imposed the obstruction enhancement because of a letter Mr. Cogswell wrote to another inmate while incarcerated at the Piscataquis County Jail. *PSR* ¶ 20. That letter is signed "Eddie" and contains references to an upcoming knee surgery for Mr. Cogswell, a desire to be released on bail for that purpose, his prosecution, and the names of several individuals who testified at trial. *Id.* In the letter, Mr. Cogswell discusses the trial and those who testified, referring to them as the Government's "'lil' snitchie-bitchie's." *Id.* He also goes on to state the following with regard to testifying witnesses "Bo" and "Ranger":

> Oh well, little does he know when everything is all done & I have nothing to do w/anyone in the Bangor area, all set w/supervised release, then I'll take care of "Bo" the (the next words are scratched out) . . . my people are gonna love hanging him up & setting him on fire, he's not even gonna get the mercy of a bullet when he scream's [sic] for it. I'll watch & laugh & that will be that.

*Id.* As the Court explained at sentencing, "Bo" is Keith "Beau" Lewis who testified against Mr. Cogswell and cooperated with the Government. *Sentencing Tr.* at 22:17-26:4.

As a Criminal History Category II with a Total Offense Level of 38, Mr. Cogswell's applicable guideline range of imprisonment was 262 to 327 months. *Cogswell Sentencing Findings* ¶ 6. The guideline range for supervised release was four to five years. *Id.* ¶ 8. The guideline fine range was $25,000 to $5,000,000. *Id.* ¶ 9. To prevent unwarranted sentencing disparities among similarly situated co-defendants, the Court sentenced Mr. Cogswell to 180 months of imprisonment, five years of supervised release, a $100 special assessment, and no fine. *J.*; *Am. J.*; *Second Am. J.*; *Statement of Reasons* at 3.

11

## III.   THE PARTIES' POSITIONS

### A.   Ed Cogswell's Amended Motion

After recounting the procedural history of this case, his medical history, risk factors for COVID-19, and the applicable legal standard, Mr. Cogswell turns to the merits of his motion. *Def.'s Mot.* at 1-7.  Mr. Cogswell first claims his "numerous medical conditions place him at high risk of death from COVID-19 and are compelling and extraordinary circumstances." *Id.* at 8.  Specifically, he asserts that his "severe sleep apnea, asthma, and obesity, along with his prior exposure to tuberculosis place him at high risk of [COVID-19] complications." *Id.* at 9.  He cites several articles, including guidance from the Centers for Disease Control and Prevention (CDC), in support of his argument that asthma, obesity, and sleep apnea increase a person's risk of complications from COVID-19 infection. *Id.* at 9-10.  He also suggests his prior exposure to tuberculosis while in BOP custody "increases his risk of [COVID-19] complications." *Id.* at 10.

Mr. Cogswell next urges he is at risk of contracting COVID-19 while in BOP custody. *Id.* at 10-11.  He claims that "38,535 inmates and 3,553 staff have recovered" but "[t]here have been 190 federal inmate deaths and 3 BOP staff member deaths attributed to COVID-19 disease." *Id.* at 11.  At his BOP facility, FCI Butner, Mr. Cogswell states "[t]here have been 223 inmates and 8 staff at Butner FCI who have tested positive for COVID-19" and that "Butner FCM lists 1 inmate and 9 staff members currently infected with [COVID-19]." *Id.*  Even so, he points out that "[a]lthough COVID-19 appears to be well-entrenched within the BOP facilities, and

at Butner, it does not need to be rampant or prevalent in a prison to be considered a factor in granting compassionate release." *Id.*

Mr. Cogswell then contends "[t]he applicable sentencing factors support reducing [his] sentence for early release." *Id.* at 13. He observes that he is fifty-five years old and has "served approximately 124 months of the 180 month sentence" which is "approximately two-thirds of his sentence." *Id.* at 13. He also contends his "conviction involves a non-violent drug offense, and his early release will not pose a danger to society." *Id.* On this front, Mr. Cogswell urges the Court to disregard the threatening letter he wrote while incarcerated. *Id.* He calls the letter "out of character" and observes he "had no history of violence before or after writing the letter 8 years ago." *Id.* He concludes "the 8 year old isolated letter does not establish a current threat to society." *Id.*

Mr. Cogswell also argues that his criminal history and his general compliance while on pre-trial release weigh in favor of granting his motion. *Id.* at 13-14. He notes that, although he received an enhanced sentence "for the presence of a firearm in the conspiracy, [he] never used a firearm as part of the conspiracy, or committed any acts of violence." *Id.* at 13-14. Aside from his federal offense, "Mr. Cogswell's criminal history is for nonviolent, non-drug crimes, such as writing bad checks, thefts, and driving charges." *Id.* at 14. He also believes he "has demonstrated he can be successful on supervision." *Id.* He notes that while on pre-trial release, with the exception of one positive drug test following a surgery in which he was prescribed pain medication, "he was clean and sober and overcame his drug addiction." *Id.* He

13

suggests that "[w]ith the passage of several years of incarceration, and removal from his prior life, it is even more likely [he] will be able to live a law-abiding life while being supervised by the probation office." *Id.*

Finally, Mr. Cogswell suggests the need to prevent unwarranted sentencing disparities favors his release. *Id.* at 14-15. He points out that "[t]he two leaders of the conspiracy Dawlin Cabrera and Jowenky Nunez both received sentences of 97 months and have completed their initial sentences." *Id.* at 14. He states that those "co-defendants are far more responsible and culpable for the conspiracy than Mr. Cogswell" and that "[r]educing Mr. Cogswell's sentence to credit for time served (approximately 124 months), is more consistent with the lighter sentences imposed on the leaders of the conspiracy." *Id.* at 15.

## B.   The Government's Opposition

The Government opposes Mr. Cogswell's motion noting that although he "is considered obese, the Court should deny the motion because [Mr. Cogswell] has not met [his] burden of establishing that a sentence reduction is warranted under the statute. [Mr. Cogswell] was an armed drug trafficker who was actively involved in a significant crack cocaine trafficking conspiracy. [He] is dangerous and granting him an early release from prison would not be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a)." *Gov't Opp'n* at 1.

The Government concedes Mr. Cogswell satisfied the compassionate release statute's administrative exhaustion requirement by submitting a request for a sentence reduction within the Bureau of Prisons (BOP) on August 18, 2020. *Id.* at 6.

14

It notes the BOP denied that request on August 28, 2020 and therefore the Court may consider the merits of his motion. *Id.* Next, relying on a review of Mr. Cogswell's medical record performed by Dr. J. Gavin Muir, Chief Medical Officer of Amoskeag Health in Manchester, New Hampshire, the Government "agrees that [Mr. Cogswell] has shown [his obesity is] an extraordinary and compelling reason for release . . .." *Id.* at 7. However, the Government acknowledges that "[a]lthough [Mr. Cogswell] also may have additional conditions, those other conditions appear to be well controlled and, other than his childhood asthma, are not identified by the CDC as conditions that put him at increased risk of serious illness." *Id.* at 7-8.

The Government cautions that it may not be appropriate to grant compassionate release on the basis of Mr. Cogswell's obesity alone. *Id.* at 8. It notes that unlike many medical conditions "obesity is not an immutable condition." *Id.* The Government cites several cases in support and points out that "[i]f obesity alone qualifies an individual for compassionate release, over half the inmate population would be eligible for release." *Id.* at 8-9

Mr. Cogswell's obesity notwithstanding, the Government urges the Court to deny his motion "because his release poses a danger to the community and, after considering the statutory sentencing factors, release is not warranted." *Id.* at 9. The Government accuses Mr. Cogswell of minimizing "his criminal conduct by calling it a 'non-violent' drug offense." *Id.* at 10. It believes this characterization "ignores [Mr. Cogswell's] active and ongoing role selling crack cocaine in the greater Bangor area." *Id.* Moreover, Mr. Cogswell "was not a minor participant in the conspiracy . . .." *Id.*

15

The Government similarly emphasizes that the Court imposed the firearms enhancement for good reason, because Mr. Cogswell "owned it, possessed it, and used it as part of the drug trafficking conspiracy." *Id.* at 11. It also states its position that Mr. Cogswell's threat against the testifying witness should not be discounted because "it was specific, it was targeted, and it revealed a chilling side of the defendant's character that the Court should not ignore." *Id.* at 12. Thus, in light of his criminal history, offense conduct, and threat to a trial witness the Government concludes Mr. Cogswell is a danger to the community and asks the Court to deny his motion. *Id.* at 12-13.

Finally, the Government considers the 18 U.S.C. § 3553(a) factors and concludes they weigh against release. *Id.* at 13. The Government takes issue with Mr. Cogswell's argument that the fact that many of his co-defendants have served their sentences justifies reducing his own. *Id.* It observes "the Court already considered the need to avoid sentencing disparities and imposed a downward variant sentence on that basis." *Id.* Furthermore, the Government reminds the Court of its observations at sentencing that Mr. Cogswell differs from several of co-defendants because he did not plead guilty, did not accept responsibility for his actions, and obstructed justice. *Id.* at 14. Thus, the Government concludes "[r]equiring [Mr. Cogswell] to serve his full sentence is necessary" to effectuate the § 3553(a) factors. It also claims that his proposed release plan to the Bangor area is "inadequate" because he "does not identify what legitimate employment he may pursue or where in Bangor he will live." *Id.* at 14-15.

16

### C.     Ed Cogswell's Reply

Mr. Cogswell makes three points in reply to the Government's opposition. *Def.'s Reply*.  First, he argues that his medical conditions, including obesity, sleep apnea, asthma, and prior exposure to tuberculosis "are an extraordinary and compelling circumstance for release." *Id.* at 1-2.  Second, he contends that he "does not pose a danger to society if released in 2021 rather than in 2025." *Id.* at 2.  He states that he is "10 years removed from the criminal conduct in this case" and "had no history of violence before this conviction." *Id.* at 3.  He also points out that he "has no disciplinary issues for violence or threats" and characterizes his other infractions as "relatively minor." *Id.*  He says he has completed some educational programming too. *Id.*  Third, he puts forth that his release plan "is adequate and appropriate." *Id.* at 4.  He believes he "previously demonstrated he can be successful on supervision" and "has financial resources through social security benefits." *Id.*  He asks the Court to infer "it is likely [he] will again be successful if he re-establishes himself in the Bangor area while on supervised release." *Id.*

## IV.    LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court has addressed the legal standard for deciding a motion for compassionate release on several occasions. *See, e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set

forth in [18 U.S.C. §] 3553(a)", and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . . ."  18 U.S.C. § 3582(c)(1)(A).[2]

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[3]  This policy statement compels a movant to meet the "requirements of subdivision (2)," which provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018) (U.S.S.G).  Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial.  They include: (1) the nature and circumstances of the offense, specifically whether the

---

[2]       Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  But the Commission promulgated these provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228, 230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.'"  *United States v. Almeida*, Nos. 2:17-cr-52-DBH-01, 2:11-cr-127-DBH-01, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37 and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *see United States v. Gowdy*, No. 20-60800 Summary Calendar, 2020 U.S. App. LEXIS 40409, at *3 (5th Cir. Dec. 28, 2020) (describing whether § 1B1.13 applies to motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) (characterizing the issue as "not frivolous").

[3]       As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion."  *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1.  Similarly, Judge Hornby of this district has ruled that this policy statement "'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'"  *United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)).  The Court agrees.

crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant.  U.S.S.G. § 1B1.13 cmt. n.1.  These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons.  *Id.* § 1B1.13 cmt. n.1 (A-D).  The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  *Id.* § 1B1.13 cmt. n.2.  Finally, it states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.* cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction."  *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

## V.   DISCUSSION[4]

---

[4]     18 U.S.C. § 3582(c)(1)(A) contains a mandatory claim processing rule, which bars some compassionate release motions as untimely.  *See Crosby*, 2020 U.S. Dist. LEXIS 199085, at *17 (citing *United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, at *3 (D. Me. Apr. 10, 2020)).  The Government conceded Mr. Cogswell exhausted his administrative remedies through an

The Court concludes Mr. Cogswell's alleged medical conditions, which are not accompanied by any corroborating medical records, do not present an extraordinary and compelling reason for his release.  The Court further concludes Mr. Cogswell is too dangerous to be released and the § 3553(a) factors do not warrant a modification of his sentence.

## A.    Extraordinary and Compelling Reasons

To grant Mr. Cogswell's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence.  According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19.  CDC guidance suggests the most decisive risk factor is a person's age.  *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Mar. 15, 2021).  Generally, the risk of COVID-19 increases as a person ages, and over eighty percent of deaths occur in people who are sixty-five or older.  *Id.*  However, people younger than sixty-five may still face high risk of complications.  *Id.*  Mr. Cogswell's PSR indicates he is currently fifty-five years of age.  *PSR* at 3.  Thus, while his age suggests he may face some risk of serious complications from COVID-19, he is not within the CDC's age-related high risk category.

People with certain medical conditions may also face high risk of serious complications.       *People    with    Certain    Medical    Conditions*,    CDC,

---

internal request within the BOP on August 18, 2020 and the BOP's August 28, 2020 denial.  *Gov't's Opp'n* at 6.  The Court agrees.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Mar. 15, 2021) (*CDC COVID Med. Conditions*). Mr. Cogswell has not met his burden to show he has such conditions because neither Mr. Cogswell nor the Government submitted his medical records to the Court. Without medical records corroborating his asserted medical conditions, the Court is chary of finding that Mr. Cogswell's medical conditions warrant his release from prison. However, even if the Court were able to review the records, the parties' submissions indicate those records likely fail to provide any extraordinary and compelling reason to release Mr. Cogswell. Both Mr. Cogswell and the Government reviewed his BOP medical records and agree that he suffers from obesity, which may increase his risk of severe complications from COVID-19, as well as obstructive sleep apnea. *See Def.'s Mot.* at 2-3; *Gov't's Opp'n*, Attach. 4, *Letter from J. Gavin Muir, MD*. The Government disputes whether Mr. Cogswell's records indicate a current asthma diagnosis. *Gov't's Opp'n* at 6-8. On this last point, as the burden falls on Mr. Cogswell to demonstrate he is entitled to compassionate release, the absence of corroborating records falls against him and the Court has not considered his alleged asthma diagnosis as proven.

Current guidance from the CDC establishes obesity, defined as a body mass index (BMI) of 30 kg/m$^2$ or higher, increases a person's risk of severe complications from COVID-19 infection and moderate-to-severe asthma may also heighten the risk. *CDC COVID Med. Conditions*. Here, the Court is not persuaded that Mr. Cogswell's circumstances are extraordinary and compelling. Although the parties agree he is

obese with a BMI of 32, they dispute his asthma diagnosis, and he is in his mid-fifties. Thus, while Mr. Cogswell faces some risk of serious complications from COVID-19 infection, the Court finds that his age and lack of underlying medical conditions other than obesity mitigate whatever risk COVID-19 poses to Mr. Cogswell and he has not demonstrated that his risk is extraordinary and compelling. Mr. Cogswell bears the burden of proof on this issue and he failed to meet it. By itself, this is a sufficient basis to deny his motion for compassionate release.

### B. Danger to the Community

The Court is concerned that Mr. Cogswell's release would endanger the safety of the community for two reasons. First, the nature of Mr. Cogswell's offense. For over a year, Mr. Cogswell operated as a middleman and distributor for an interstate crack cocaine distribution conspiracy operating in the Bangor area. At sentencing, the Court explained that it viewed this as "a very significant role." *Cogswell Sentencing Tr.* at 61:22. "Big-city drug conspiracies who begin to operate in a small city like Bangor have to have people just like [Mr. Cogswell]." *Id.* at 61:23-24. After all, "local people are very reluctant to deal with strangers from a big city. But they're not as reluctant to deal with their own friends, a known commodity, a local boy." *Id.* at 62:4-7. The Court still views it as especially troubling that Mr. Cogswell's role was increasing during the life of the conspiracy, and he even moved in with his Dominican co-conspirators to help handle the drug proceeds. *Id.* at 62:14-23. Moreover, Mr. Cogswell was "fundamentally unrepentant" for his actions. *Id.* at 63:1.

22

Additionally, Mr. Cogswell's offense involved a firearm.  *Def.'s Reply* at 3. Mr. Cogswell traded a Hi-Point .380 pistol to the drug dealers in December 2010 in exchange for ten bags of crack cocaine.  *Cogswell Sentencing Tr.* at 17:23-25.  By then, he was already a part of the conspiracy.  *Id.*  Moreover, as the Court previously explained, Mr. Cogswell's assertions that he did not have access to the gun are contradicted by testimony from his co-conspirators, namely Jowenky Nuñez.  *Id.* at 18:5-8.  Mr. Nuñez said that the gun was always in the house and he carried it frequently but that the conspiracy continued to view the gun as belonging to Mr. Cogswell.  *Id.* at 18:8-12.  In any event, because the gun was essentially a house gun possessed by co-conspirators but viewed as Mr. Cogswell's, he had constructive possession of the gun for purposes of the firearms enhancement.  *Id.* at 18:15-21.

The fact that Mr. Cogswell "did not carry the gun himself as part of the trafficking," *Def.'s Mot.* at 3, does not alter the Court's analysis.  Some of Mr. Cogswell's co-conspirators, particularly Jowenky Nuñez, were also dangerous. Therefore, the distinction Mr. Cogswell attempts to draw between carrying the gun himself and merely providing it to other members of the conspiracy does not support his release.  Furnishing the gun to his co-conspirators amplified the risk that it would be used in a crime of violence.  It is easy to see why.  Mr. Cogswell's co-conspirators kept the gun at the conspiracy's headquarters where drug sales took place and where the drugs were stored.  Guns and crack cocaine endanger the public safety in their own right.  Mr. Cogswell mixed the two and, based on his past conduct, his release would endanger the public.

The second reason the Court believes Mr. Cogswell is dangerous is the letter dated March 17, 2013 that he wrote to another inmate while incarcerated at the Piscataquis County Jail.  In the letter, Mr. Cogswell threatened to  have "his people" kill a cooperating witness, Mr. Lewis, by hanging him and burning him alive.  Mr. Cogswell intended to mirthfully observe the torturous ordeal, writing "I'll watch & laugh & that will be that."

The Court still "views this threat as a most serious threat." *Cogswell Sentencing Tr.* at 26:6.  Persistently troubling for the Court is that Mr. Cogswell's letter about Mr. Lewis had significant undertones of racially motivated violence.  Mr. Lewis is African American, and Mr. Cogswell essentially threatened to lynch him. The Court continues to deem these threats "especially chilling in light of this country's tragic racial history, and it was calculated, in the [C]ourt's view, to instill added fear in Mr. Lewis." *Id.* at 26:12-14.  In addition, Mr. Cogswell wrote the letter after January 31, 2013, when he was convicted by a jury of engaging in this drug trafficking conspiracy.  The Court remains troubled that Mr. Cogswell would blame others for his own criminal activity and that he would do so, when he was awaiting federal sentencing, a time when most defendants are extremely cautious.

Armed drug traffickers belong in prison, especially when they plan to lynch a cooperating witness.  The Court's statements to Mr. Cogswell at sentencing ring true to this day: "the letter reveals the real Ed Cogswell – a soldier for a criminal enterprise." *Id.* at 63:12-13.  Mr. Cogswell, "[w]hat your letter told me . . . is that you're biding your time.  You'll serve your sentence.  When you get out, you'll track

[Mr. Lewis] down and you may hurt him. And from my perspective, that requires me to impose a sentence that is fairly significant because it's not only your role directly in the conspiracy, it is your utter lack of self-awareness about your own role in causing yourself to be where you are today that causes me concern." *Id.* at 63:18-64:1. Thus, the Court concludes Mr. Cogswell's release would endanger public safety and declines to release him.

### C.    The Section 3553(a) Factors

The Court also concludes the § 3553(a) factors weigh against Mr. Cogswell's release. The Court considered these factors when it sentenced Mr. Cogswell and Mr. Cogswell has not given the Court reason to overturn its prior determinations. As just discussed, the nature and circumstances of Mr. Cogswell's offense and the need to protect the public favor continued incarceration. Deterrence does too. Mr. Cogswell was an indispensable cog in the conspiracy's wheel. He worked for the conspiracy, which was led by individuals from New York, and leveraged his own connections in Maine to sell drugs. When the Court imposed a substantial sentence against Mr. Cogswell, it intended to send a message not only to Mr. Cogswell but also to others that involvement in sophisticated drug trafficking organizations would lead to a significant period of incarceration. Releasing Mr. Cogswell before the end of his sentence would undermine this goal.

Mr. Cogswell is correct that two of his co-defendants who led the conspiracy, Dawlin Cabrera and Jowenky Nuñez, were far more culpable than him yet received more lenient sentences. Even so, the Court does not find this warrants a

compassionate release reduction in Mr. Cogswell's sentence. The Court considered the need to avoid unwarranted sentencing disparities among similarly situated defendants when it sentenced Mr. Cogswell. *Cogswell Sentencing Tr.* at 60:6-20. At sentencing, the Court observed that "it is difficult to draw a clear, bright line through these sentences" because "[e]ach of these defendants [had] different criminal histories, different roles, some pleaded guilty, some went to trial . . .." *Id.* In other words, many defendants were not similarly situated to Mr. Cogswell. The First Circuit agreed with this Court when it rejected Mr. Cogswell's appeal. *Trinidad-Acosta*, 773 F.3d at 321-22 ("[Mr.] Cogswell is not similarly situated to his coconspirators since, at a minimum, he did not plead guilty and accept responsibility for his crimes nor did he cooperate with the government"). Therefore, as the First Circuit affirmed, the differences in the Defendants' sentences were, in fact, warranted.

Mr. Cogswell specifically raises Mr. Cabrera's comparably lenient sentence, though the argument is entirely unpersuasive. It is true that Mr. Cabrera led the conspiracy while Mr. Cogswell was a middleman, and despite this, Mr. Cogswell received a prison sentence that was five years longer.

But, as Mr. Cogswell well knows, there are very significant differences between Mr. Cabrera and him.[5] One difference is that Mr. Cabrera pleaded guilty and Mr. Cogswell went to trial. Because Mr. Cabrera entered a guilty plea, he received a

---

[5] There are similar differences between Mr. Cogswell and Jowenky Nuñez, but the Court will examine only Mr. Cabrera specifically. A similar analysis applies to Mr. Nuñez, who also cooperated with the Government, and who testified against Mr. Cogswell and Manuel Trinidad-Acosta. *See Tr. of Proceedings*, *Jury Trial*, at 306:12-337:2 (ECF No. 593); *Id.* at 341:19-413:21 (ECF No. 594).

three-level reduction in the calculation of his offense level under the Guidelines; whereas, Mr. Cogswell did not. *Compare Cogswell Sentencing Findings* ¶¶ 1-6, *with Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* ¶ 6 (ECF No. 497) (*Cabrera Sentencing Findings*).   A second difference is that Mr. Cogswell was a criminal history category II and Mr. Cabrera was a criminal history category I. *Compare Cogswell Sentencing Findings*, ¶ 5, *with Cabrera Sentencing Findings* ¶ 8. Mr. Cabrera was held responsible for a slightly greater drug quantity and received several enhancements, his total offense level was 41, which at a criminal history category I, resulted in a guideline sentence range of 324 to 405 months. *Cabrera Sentencing Findings* ¶¶ 1-12.   By contrast, Mr. Cogswell's guideline calculation resulted in a total offense level of 38, which at a criminal history category II, resulted in a guideline sentence range of 262 to 267 months. *Cogswell Sentencing Findings*, ¶¶ 1-9.

The most critical difference, however, is that Mr. Cabrera cooperated with the Government and testified on its behalf in two criminal trials, including Mr. Cogswell's jury trial. *Partial Tr. of Proceedings*, *Jury Trial* at 36:9-97:7 (ECF No. 412); *United States v. Kizzy Fader*, No. 1:12-cr-00007-JAW, *Partial Tr. of Proceedings*, *Test. of: Dawlin Cabrera* at 3:18-89:12 (ECF No. 73). As a consequence of his cooperation, the Government moved to reduce Mr. Cabrera's sentence pursuant to U.S.S.G. § 5K1.1. *See Tr. of Proceedings*, *Sentencing Proceedings*  at 5:24-25 (ECF No. 579) ("I have reviewed the contents of the government's 5K1 motion.  I am hereby granting that motion").  At Mr. Cabrera's sentencing hearing, the Government recommended that

the Court impose a sentence of 120 months in view of his cooperation, the sentence the Court originally imposed. *Id.* at 7:22-24; *J.* (ECF No. 496).[6]  By contrast, Mr. Cogswell elected not only to go to trial, but not to cooperate with the Government. These were his choices and he cannot now gain the sentencing benefit of choices he did not make, but Mr. Cabrera did.  In short, Mr. Cogswell is not similarly situated to Mr. Cabrera.

Finally, the Court expressly took Mr. Cabrera's lenient sentence into account when it later sentenced Mr. Cogswell.  *Cogswell Sentencing Tr.* at 60:21-61:6.  As the Court pointed out then, a troubling aspect of Mr. Cogswell's case was that his inappropriate conduct seemed to have been increasing, not decreasing, especially in view of his "vile threat to Mr. Lewis to hang and burn him after his time in prison and his supervised release ended." *Id.* at 59:25-60:5.  For this reason, Mr. Cogswell's one hundred eighty-month sentence, approximately seven years below his guideline range of two hundred sixty-two to three hundred twenty-seven months, was appropriate in 2013 and remains appropriate today.

No modification of sentence is appropriate.  Section § 3553(a) calls upon a district judge to weigh a number of factors when determining the appropriate sentence for a criminal defendant.  A further reduction in Mr. Cogswell's sentence would be contrary to this Court's obligation under 18 U.S.C. § 3553(a)(2)(A) to consider "the seriousness of the offense, to promote respect for the law, and to provide

---

[6]     On March 31, 2015, the Court reduced Mr. Cabrera's sentence to 97 months pursuant to an amendment of the Guidelines retroactively reducing his offense level by two levels based on changes in drug quantity calculations. *See Def.'s Am. Mot. for Sentence Modification* (ECF No. 842); *Order Regarding Mot. for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2)* (ECF No. 855).

just punishment." Mr. Cogswell's conduct during the course of the crack cocaine distribution conspiracy was serious organized criminal activity, which necessitates a significant punishment. Thus, the Court concludes the § 3553(a) factors do not support release.

## VI.   CONCLUSION

The Court DISMISSES without prejudice Ed Cogswell's Amended Petition for Compassionate Release (ECF No. 1055).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2021.